IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

ADVISORS ASSET MANAGEMENT, INC.,

        Plaintiff,

        v.

BAHL & GAYNOR, INC.,

        Defendant.

Case No. \_\_\_\_

## VERIFIED COMPLAINT

Plaintiff Advisors Asset Management, Inc. ("AAM" or "Plaintiff") files this Verified Complaint for Preliminary Injunctive Relief against Defendant Bahl & Gaynor, Inc. ("B&G" or "Defendant") and alleges as follows:

## INTRODUCTION

1. AAM is an independent distributor of mutual funds, exchange-traded funds and other investment products and strategies created by investment managers. Since 2010, AAM has marketed and distributed B&G's investment products and strategies to AAM's extensive and well-developed network of clients. This Verified Complaint arises from B&G's ongoing breaches of the Amended and Restated Portfolio Manager Engagement Agreement (the "PMEA"), the primary agreement governing the parties' relationship. In that agreement, B&G covenanted that it would not market to or solicit AAM's customers without AAM's prior written approval. In spite of this covenant, B&G has begun marketing to AAM's customers as part of its recently developed plan to perform its own marketing functions instead of working with AAM. These breaches are exacerbated by the fact that B&G has induced six of AAM's former employees to violate their

non-solicitation agreements with AAM in order to do so, thereby tortiously interfering with valid and enforceable contracts between AAM and its former employees.

## PARTIES

2. AAM is a Delaware corporation with its principal place of business in Monument, Colorado. AAM is also a registered broker-dealer, registered investment advisor and investment company that is licensed and doing business in all 50 states.

3. Upon information and belief, B&G is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000 (exclusive of interest and costs) and is between citizens of different states.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(3) because Defendant is an Ohio corporation with its principal place of business within this district.

## FACTUAL BACKGROUND

**A.  The Parties**

6. AAM is a registered broker-dealer, registered investment advisor and investment company that is licensed and doing business in all 50 states. AAM is engaged as an independent distributor of separately managed accounts, mutual funds, exchange-traded funds and other investment products and strategies created by investment managers. AAM contracts with investment managers to market and distribute their funds and strategies to the administrators and sponsors of investment advisory, asset management and financial planning programs. These administrators and sponsors then make those funds and strategies available to their retail clients.

In exchange for these services, AAM receives a service fee, which typically is a percentage of the advisory fees that the manager receives.

7. AAM has spent decades building the expertise, infrastructure and relationships necessary to market and distribute investment products on a nationwide scale. Among other things, AAM has hired, trained and cultivated a team of salespeople whose sole function is to market managers' products and strategies to administrators and sponsors of investment advisory, asset management and financial planning programs. Through AAM's investment, these salespeople—known as wholesalers—develop and maintain deep relationships in the industry. These relationships and the goodwill they engender are critical to AAM's success.

8. B&G is one of the managers for which AAM provides marketing and distribution services. One of B&G's primary offerings are model investment portfolios that B&G provides to administrators and sponsors of investment advisory, asset management and financial planning programs for retail investors. These administrators and sponsors then apply these model portfolios in their own customers' separately managed accounts. AAM has marketed B&G's model portfolios since 2010, beginning with the model portfolio employing B&G's income growth strategy, which focuses on investing in companies that pay dividends and have a potential for earnings and capital appreciation growth.

9. At the outset of the parties' relationship, B&G had limited distribution capabilities and relationships within the financial services industry. As a result, there was just $50 million in assets under management in separately managed accounts using B&G's income growth strategy. Using the knowledge, experience and relationships that AAM had spent decades developing, AAM helped B&G expand the assets under management in separately managed accounts following this income growth strategy to over $29 billion as of June 30, 2023. At the same time, B&G's asset-

based advisory revenue has grown proportionally. Over time, AAM also has assumed responsibility for marketing B&G's other model portfolios and related products. As of June 2023, the total assets under management across all products that AAM markets for B&G is over $33 billion, which is approximately 60 percent of B&G's total assets under management.

**B.      The PMEA**

10.     Since 2010, AAM and B&G's relationship has been governed by a series of agreements. The current agreement is the Amended and Restated Portfolio Manager Engagement Agreement, which AAM and B&G entered into as of July 14, 2021.

   **i.    AAM's Rights and Obligations Under the PMEA**

11.     Under the PMEA, AAM is responsible, "in its sole discretion" for presenting B&G to "one or more Sponsors as a candidate for the provision of Manager Services under Sponsor Programs." (PMEA § 3.1.) "Sponsors" are defined as "sponsors or administrators of Programs, together with investment advisers or other financial institutions who participate in such Programs or provide advisory and related investment services to investors through such Programs." (*Id*. § 1.) A "Program" is defined as a "wrap fee, investment advisory, asset management and financial planning program." (*Id*.) In practice, this means that AAM is responsible for convincing Sponsors such as Merrill Lynch, Morgan Stanley and UBS to make B&G's products available to these Sponsors' retail investors, and then persuading the financial advisors employed by each Sponsor to advise their retail clients to invest in those products.

12.     In addition, AAM "may, in its sole discretion, present [B&G] to Clients as a candidate for provision of Manager Services under Sponsor Programs to the extent permitted by applicable Sponsors." (PMEA § 3.2.) "Clients" are defined to mean "a Client of a Sponsor that participates in a Program of such Sponsor." (*Id*. § 1.) Thus, a "Client" is a customer of a Sponsor. If a Sponsor permits and AAM chooses to market B&G directly to Clients, then AAM agrees to

"perform its duties . . . in a manner consistent with [B&G's] instructions, and the provisions of" the Investment Advisers Act of 1940. (PMEA § 3.2.) In practice, however, AAM rarely markets to Clients, focusing instead on marketing to Sponsors. The PMEA does not give B&G the right to provide any instructions to AAM when AAM markets directly to Sponsors. B&G has never issued instructions to AAM with respect to Client marketing.

13. As part of the marketing responsibilities B&G delegated to AAM under the PMEA, AAM is tasked with creating a profile of B&G, including B&G's historical performance, investment objectives, and investment strategies, and may also prepare other marketing materials. (*See id.* § 3.3.) While B&G has the right to review and ensure the accuracy of those materials, *see id*. § 2.4, AAM alone is responsible for presenting these documents to Sponsors and Clients, *see id*. § 3.3. AAM also is responsible for disseminating SEC-mandated disclosure documents to Sponsors and, if required by the Sponsor, to the Sponsor's Clients. (*See id*. § 3.5.) AAM likewise is responsible for providing non-discretionary administrative services to Sponsors, providing performance information for Client account, entering securities transactions and maintaining records. (*See id*. §§ 3.6-3.9.) Indeed, the PMEA provides that "AAM will maintain Sponsor relationships from an administrative perspective." (*Id*. § 3.6.)

14. In exchange, B&G pays AAM a service fee, which typically is 50 percent of the investment advisory fee that B&G receives from each Sponsor. (*See id*. § 4 & Ex. C.)

  **ii.**   **B&G's Rights and Obligations Under the PMEA**

15. B&G's obligations under the PMEA are investment-strategy related. B&G agrees that "AAM will offer Manager's investment advisory services to Sponsors and Clients, and if selected by or for a Client, Manager shall provide discretionary investment Manager Services" consistent with the relevant investment strategy. (*Id*. §2.1(a).) "Manager Services" are defined as "Investment Recommendations, and all other investment advisory and other services required to

5

be performed by [B&G] with respect to a Client or Sponsor pursuant to this Agreement, any agreement between a Sponsor and Manager or AAM, and each Advisory Agreement." (*Id.* § 1.) "Investment Recommendations" are defined as recommendations to buy or sell securities, generally through model portfolios and purchase-and-sell guidelines that B&G creates and then provides to Sponsors, which can decide whether to implement in their Clients' accounts (*Id.* § 1.)

16. B&G does not communicate its investment recommendations directly to Sponsors or Clients. Instead, B&G provides these recommendations to AAM, which in turn provides them to Sponsors and Clients. (*See id.* § 2.2(c) & Ex. B.)

17. B&G does not have marketing rights or obligations under the PMEA. In fact, under Section 9 of the PMEA, B&G covenants not to solicit or market to any Sponsors or Clients without AAM's prior written consent during the term of the PMEA and for 90 days thereafter:

> To the fullest extent permitted by applicable law, [B&G] agrees that without the prior written consent of AAM, which consent AAM may withhold at its sole discretion, Manager will not directly or indirectly solicit or market to a Sponsor or Client for the purpose of providing, directly or indirectly, professional services of any kind whatsoever (including, without limitation, investment advisory services), other than pursuant to this Agreement, during the Term of this Agreement and for a period of ninety (90) days after the date of termination of this Agreement.

(*Id.* § 9.1(a).) The only exceptions to this covenant are a limited number of Sponsors and Programs identified in Exhibit D of the PMEA. (*See id.* § 9.1(b) & Ex. D.) AAM has not provided written consent to B&G to solicit or market to any Sponsor or Customer.

18. None of the other provisions of the PMEA would require or permit B&G to solicit or market to any Sponsors or Clients without AAM's prior consent. For example, B&G agrees that it will support AAM's marketing and sales efforts, but only as AAM requires. (*See id.* § 2.4(c).) B&G similarly agrees to generally assist AAM, but only "to provide any assistance that AAM

reasonably may request to further the provisions and purposes of this Agreement." (*Id.* § 2.10.) And while B&G has the right to review and ensure the accuracy of the marketing materials that AAM prepares, *see id*. § 2.4(a), as noted above, AAM alone is solely responsible for presenting these documents to Sponsors and Clients, *see id.* § 3.3. Finally, whenever a Sponsor provides any documents or communications directly to B&G, B&G is required to "promptly" provide those materials to AAM. (*Id.* § 2.09(b).) AAM has no reciprocal obligation to B&G.

### iii. The Term and Termination of the PMEA

19. The initial term of the PMEA ends on March 15, 2025, and will extend for successive one-year terms unless either party provides written notification at least 60 days prior to the end of the then-current term of its decision not to renew the agreement. (*See id*. § 5.1.) As noted above, B&G is forbidden from directly or indirectly soliciting or marketing to Sponsors or Clients without AAM's prior written consent until 90 days after the termination of the PMEA. At the same time, AAM is expressly permitted to contract with managers other than B&G, including managers that employ "investment styles or strategies similar to those of" B&G. (PMEA § 9.1(b).) Furthermore, in the event that either party terminates the PMEA (or a Sponsor or Client terminates its agreement with B&G) for any reason, B&G is required to assist AAM in transitioning Client accounts to another manager of AAM's choosing. (*Id.* § 5.2.)

### C. The Parties' Performance Under the PMEA

20. Until recently, AAM's and B&G's performance under the PMEA has followed the agreement's terms. Through its team of wholesalers, AAM has marketed B&G to Sponsors and Clients, and solicited these parties to invest in B&G's model portfolios and other products. AAM has done so by presenting B&G to Sponsors for inclusion in their investing platforms and then hosting periodic meetings with representatives of Sponsors, including financial advisors employed by Sponsors, to discuss B&G, its investment offerings, and its performance. B&G employees

generally have not participated in these discussions, preferring to focus on B&G's core competency of providing investment recommendations. In fact, B&G never asked for AAM's consent to solicit or market to Sponsors or Clients directly, and AAM has never provided that consent—in writing or otherwise. Whenever a Sponsor wanted to meet with B&G, the Sponsor would make that request through AAM, which in turn would facilitate (and attend) the meeting along with B&G's representatives.

21. AAM has also been the primary point of contact for Sponsor and Clients with respect to investment, administrative and record-keeping functions. For example, consistent with the terms of the PMEA, B&G has communicated all investment recommendations to AAM, which in turn has provided them to all Sponsors. AAM also has prepared and disseminated all marketing materials to Sponsors and Clients; provided Sponsors and Clients with all of B&G's SEC-mandated disclosure documents; and made B&G's records available to Sponsors and Clients as necessary.

**D.  B&G Attempts to Renegotiate the PMEA to Assume AAM's Marketing and Solicitation Duties**

22. In or about September 2022, AAM's parent company, AAM Holdings Inc. ("AAM Holdings"), Sun Life (U.S.) Holdco 2020, Inc. ("Sun Life") and certain other parties entered into an Agreement and Plan of Merger dated as of September 1, 2022 (the "Merger Agreement"). As set forth in the Merger Agreement, Sun Life agreed to acquire 51 percent of the shares of AAM Holdings (the "Merger"). On October 24, 2022, Stephen Peacher (the president of SLC Management, the institutional investment management business of Sun Life), Scott Colyer (the chairman and chief executive officer of AAM) and Cliff Corso (the president and chief investment officer of AAM), among others, met with B&G chief executive officer Bob Groenke and others at

B&G to discuss the details of the proposed merger. B&G expressed no objections to the transaction.

23. The Merger closed on February 1, 2023. On April 28, 2023, Bob Groenke contacted Steve Peacher and informed him that B&G intended to terminate the PMEA at the end of its current term. Shortly thereafter, B&G provided a proposed term sheet to amend and restate the PMEA. B&G proposed, among other things, to (i) remove B&G's covenant not to solicit Sponsors and Clients, (ii) transition AAM's marketing and administrative duties under the PMEA to B&G by no later than June 30, 2024, and (iii) terminate the PMEA on March 15, 2025.

24. AAM and Sun Life did not respond to this proposal. B&G subsequently made two additional proposals directly to AAM. In the first, B&G proposed a "[c]o-marketing arrangement" through 2027 in which B&G would "absorb[] AAM PMEA functions quickly during a smooth transition," with B&G reducing the service fees it paid to AAM during that time. B&G later proposed extending the co-marketing period until June 30, 2028. AAM did not accept either proposal, both of which would have reduced the fees payable to AAM over the term of the agreement by up to 50 percent.

E. **After Negotiations Fail, B&G Markets to Sponsors in Violation of the PMEA**

25. When AAM did not agree to B&G's proposals to shift AAM's exclusive marketing function to B&G by renegotiating the PMEA, B&G instead decided to simply market to Sponsors and Clients anyway. First, in June 2023, B&G hired 12 AAM employees, including six AAM wholesalers who resigned from AAM *en masse* on June 30, 2023 (the "Former AAM Salespeople"). These Former AAM Salespeople are Neal Lee, Andrew Raia, Ryan Welch, Joseph Beshara, Steven Mazzuchelli and Jeff Rosen. Each of the Former AAM Salespeople was a long-tenured employee of AAM whose only job at AAM was to market AAM products, including products offered by B&G and other managers, to Sponsors. AAM made substantial investments

in training each of these individuals, and also in helping them build relationships and goodwill with Sponsors, including the financial advisors that each Sponsor employs.

26. Each of the Former AAM Salespeople is subject to a "Confidentiality Agreement" that precludes him from using or disclosing AAM's confidential information, and also from soliciting or encouraging others to solicit customers of AAM. Specifically, each agreed that "I will not, either directly or indirectly, separately or in association with others, interfere with, impair, disrupt or damage AAM's relationship with any of its customers or customer prospects by soliciting or encouraging others to solicit any of them for the purpose of diverting or taking away business form AAM." Lee, Raia, Welch and Beshara agreed to abide by this restrictive covenant for two years after the termination of their respective employment at AAM. Mazzuchelli and Rosen agreed to abide by these restrictive covenants for one year and 90 days following termination of their respective employment with AAM.

27. AAM reminded both B&G and the Former AAM Salespeople of these obligations, and also reminded B&G of its covenant not to solicit Sponsors or Clients during the term of the PMEA and for 90 days thereafter. Notwithstanding these reminders, B&G has taken steps to market to and solicit Sponsors, and has deployed the Former AAM Salespeople to do so. On July 11, 2023, B&G CEO Bob Groenke circulated within B&G a one-page PowerPoint presentation detailing his plans to market to Sponsors notwithstanding B&G's obligations under the PMEA. AAM learned of this document only because Groenke inadvertently sent it to the AAM email address of one of AAM's now-former employees. Groenke stated that B&G would provide "proactive and reactive service and support" to new and existing financial advisors who worked for Sponsors. In a transparent ploy to evade the PMEA and the Former AAM Salespeople's agreements with AAM, Groenke told B&G employees to "avoid sales-type approach/language,

i.e. B&G is 'Soliciting and Marketing'" and stated that B&G would provide these services under the guise of B&G's "institutional service efforts." However, no amount of careful wording can change the fact that the Former AAM Salespeople's only job experience is marketing products to Sponsors and the financial advisors that these Sponsors employ. Moreover, none of the Former AAM Salespeople have experience servicing institutional accounts, and none of the financial advisors that these salespeople market to generally are considered "institutional" in nature. Notwithstanding their lack of any experience servicing institutional accounts, each of the Former AAM Salespeople now holds himself out as an "Institutional Portfolio Consultant."

28. AAM became aware of Groenke's email on July 13, 2023. Shortly thereafter, AAM warned B&G that Groenke's plan violate the PMEA, and that each of the Former AAM Salespeople was subject to non-solicitation obligations. Scott Colyer of AAM also had told Groenke during a telephone call on June 8, 2023 that all AAM employees were subject to restrictive covenants. Moreover, prior to learning of Groenke's email, AAM separately advised B&G that AAM would reject any requests by B&G employees to visit Sponsors or Clients jointly with AAM personnel. Notwithstanding these communications, B&G has begun marketing to and soliciting Sponsors without AAM's prior written consent, including through the Former AAM Salespeople, each of whom B&G reportedly has provided a marketing budget of $12,000 per month. For example,

- On or about July 24, 2023, Jeff Rosen scheduled a lunch meeting with 30 Merrill Lynch financial advisors in Atlanta, Georgia. This is precisely the same work that Rosen had performed for AAM. Indeed, Rosen met with this same group of financial advisors in February 2023 when he worked at AAM solely for the purpose of marketing the managers on AAM's platform (including B&G) to these financial advisors. These financial advisors, moreover, service only private, retail accounts. B&G did not seek AAM's consent before scheduling this meeting, which AAM learned of only because the Merrill Lynch scheduler inadvertently emailed Rosen's AAM email address to confirm the meeting and menu.

11

- On July 25, 2023, Neal Lee asked his B&G colleague for B&G's policies on sponsoring client events for financial advisor teams at Sponsors, indicating that "I have a couple of teams seeking sponsorship for a few things and just want to make sure I engage them correctly." AAM learned of this communication only because Lee inadvertently sent the email to the AAM email address of another former AAM employee who now works at B&G.

- Joe Beshara has called Sponsors without AAM's prior knowledge or permission. B&G did not seek AAM's consent before Beshara made these calls. AAM learned of these communications only because two financial advisors inadvertently returned Beshara's calls by dialing his old AAM phone number. These financial advisors—who work at Morgan Stanley and Merrill Lynch, respectively—service only retail clients.

- On July 25, 2023, two B&G employees held a webinar with financial services company (and Sponsor) Raymond James, to detail B&G's 2023 performance, holdings and investment strategy. This is precisely the information that *AAM* is tasked with providing under the PMEA. Days later, a former AAM employee, John (J.P.) Galvin, requested that Raymond James grant B&G access to Raymond James' Partner Connect website, which is accessible only to partners of Raymond James, such as AAM. It includes, among other information, a complete list of all financial advisors that Raymond James employs—information that would be valuable to target B&G's marketing efforts. AAM learned of Galvin's outreach only because Raymond James contacted AAM because they believed that Galvin's request was improper due to his employment with B&G.

- On August 15, 2023, Andrew Raia hosted a lunch meeting on B&G's behalf for a group of at least 17 financial advisors from Sponsor Morgan Stanley in Chicago. B&G did not seek AAM's consent before scheduling this meeting, which AAM learned of only because a Morgan Stanley receptionist inadvertently emailed Raia's AAM email address to confirm the lunch details.

## COUNT I
### (Breach of Contract)

29. AAM incorporates the prior paragraphs of the Verified Complaint as if fully set forth herein.

30. The PMEA is a valid, binding and enforceable contract between AAM and B&G.

31. In the PMEA, B&G agreed to not "directly or indirectly solicit or market to a Sponsor or Client for the purpose of providing, directly or indirectly, professional services of any kind whatsoever", other than pursuant to the PMEA, without AAM's prior written consent.

32. As described above, B&G breached this obligation by directly and indirectly soliciting and marketing to Sponsors and Clients for the purpose of providing professional services, other than pursuant to the PMEA, and without seeking or obtaining AAM's prior written consent.

33. B&G's breach of the PMEA has proximately caused financial harm to AAM in an amount to be proven at trial, but not less than $75,000.

## COUNT II
### (Tortious Interference with Contract)

34. AAM incorporates the prior paragraphs of the Verified Complaint as if fully set forth herein.

35. The Confidentiality Agreements are valid, binding and enforceable contracts between AAM and the Former AAM Salespeople.

36. At all relevant times, B&G had knowledge of the Confidentiality Agreements.

37. B&G intentionally procured a breach of the Confidentiality Agreements by inducing the Former AAM Salespeople to solicit and market to AAM's customers—*i.e.*, the Sponsors and Clients—as a part of B&G's scheme to take the Sponsors' business away from AAM.

38. As described above, B&G lacks any justification for its actions.

39. B&G's tortious interference with the Confidentiality Agreements has proximately caused financial harm to AAM in an amount to be proven at trial, but not less than $75,000.

## THE NECESSITY OF INJUNCTIVE RELIEF

40. AAM, in an effort to mitigate its damages, seeks entry of preliminary injunctive relief enjoining B&G, and those acting in concert with B&G, from violating B&G's obligations to AAM under the PMEA and from continuing to tortiously interfere with the non-solicitation

obligations of the Former AAM Salespeople. There is no adequate remedy at law to prevent B&G's wrongful conduct, unless B&G is enjoined.

41. Injunctive relief is necessary to maintain the status quo of the parties' existing and bargained for relationship as set out in the PMEA, pending final resolution of the parties' dispute pursuant to the Dispute Resolution Provision contained in the PMEA. In that provision, the parties agreed that, "[i]n the event of any controversy, dispute or claim arising out of or relating to [the PMEA], or the breach thereof," such controversy, dispute or claim shall be settled by an arbitration administered by the Financial Industry Regulatory Authority, Inc. ("FINRA"). Pursuant to its Code of Arbitration Procedure for Industry Disputes, FINRA does not provide preliminary injunctive relief; a party in need of such relief must seek it from a court of competent jurisdiction.

42. Injunctive relief is further necessary to maintain the status quo of AAM's existing and bargained for right to the Former AAM Salespeople not soliciting Sponsors and Clients for a period of time following their termination.

43. AAM has suffered and will continue to suffer irreparable injury if injunctive relief is not granted. There is no harm to B&G by requiring it to comply with the terms of the PMEA, or to any third party. There is similarly no harm to B&G by requiring it not to interfere with a valid, binding and enforceable contract between AAM and the Former AAM Salespeople, nor to any third party.

44. The granting of injunctive relief will serve the public interest in enforcing the legal rights of the parties, and in limiting the extent of the damages AAM will incur as a result of B&G's continued breach of the PMEA and continued interference with the Confidentiality Agreements.

**WHEREFORE**, AAM respectfully requests that the Court:

1. Enter an injunction restraining B&G and those acting in concert with B&G from:

    a. Contacting any Sponsor or Client as those terms are defined in the PMEA (other than any Sponsor or Program expressly identified in Exhibit D of the PMEA) without AAM's prior written approval; and

    b. Inducing or permitting the Former AAM Salespeople to solicit any of AAM's customers or customer prospects, including without limitation any Sponsors or Clients.

2. Following issuance of a preliminary injunction, enter a stay of this action, as it pertains to Count I, pending arbitration;

3. Enter an order awarding AAM its court costs, and reasonable attorneys' fees and expenses; and

4. Such other and further relief to Plaintiff as the Court deems just and proper.

Dated: August 16, 2023

    BARNES & THORNBURG LLP

    By: /s/ *Robert C. Folland*
    Robert C. Folland (0065728) (Trial Attorney)
    41 S. High Street, Ste. 3300
    Columbus, Ohio 43215-6104
    Telephone: (614) 628-1401
    Facsimile: (614) 628-1433

    Joseph A. Matteo (PHV application forthcoming)
    Charlotte Underwood (PHV application forthcoming)
    Nicholas E. Rybarczyk (PHV application forthcoming)

    390 Madison Avenue, 12th Floor
    New York, New York 10017
    Telephone: (646) 746-2000
    Facsimile: (646) 746-2001

    *Attorneys for Plaintiff Advisors Asset Management, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

---

ADVISORS ASSET MANAGEMENT, INC.,

        Plaintiff,

v.

BAHL & GAYNOR, INC.,

        Defendant.

Case No. _____

---

## VERIFICATION

I, Scott Colyer, being duly sworn, states as follows:

1. I have read the foregoing Verified Complaint.

2. To the extent I have personal and direct knowledge of the facts alleged by Plaintiff in the Verified Complaint, those allegations are true and correct to the best of my knowledge, information, and belief.

3. To the extent I do not have personal and direct knowledge of the facts alleged by Plaintiff in the Verified Complaint I believe those allegations to be true and correct.

4. This verification is made under penalty of perjury.

_____
Scott Colyer

SUBSCRIBED AND SWORN before me this 15th day of August 2023.

_____
Notary Public

MICHELE R. GUERRA
Notary Public, State of Texas
Comm. Expires 11-14-2023
Notary ID 126294820